IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America<br><br>v.<br><br>Michael Smith a.k.a "Fat Mike" a.k.a "Big Mike" | Case No. 3:19mj 1738 (SALM)<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**SEARCH AND ARREST WARRANT**

I, Scott Vitelli, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I am currently assigned to the New Haven District Office Task Force.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am currently employed by the West Haven Police Department in the State of Connecticut and have been for approximately 10 years. While employed at the West Haven Police Department, I have previously been assigned to the Street Crime Unit (SCU) for approximately three (3) years. I have been assigned to the DEA as a Task Force Officer since October 2017. During my tenure as a police officer and Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking. I am currently assigned to the New Haven District Office, Organized Crime Drug Enforcement Task Force, ("Task Force") which is composed of personnel from the DEA, United States Marshal Service ("USMS"), New Haven Police Department ("NHPD"), West Haven Police

Department ("WHPD"), North Haven Police Department, Branford Police Department, ("BPD"), Meriden Police Department ("MPD"), Ansonia Police Department ("APD"), Middletown Police Department ("MPD"), Naugatuck Police Department ("NPD"), Waterbury Police Department ("WPD") and Hamden Police Department ("HPD"). Prior to my current assignment at the DEA NHDO, I was assigned to the WHPD SCU which the primary goal is to arrest and convict street level narcotics traffickers within the City of West Haven and surrounding areas. During my time with SCU, I have completed numerous arrest and search warrants. I have traveled throughout much of Connecticut dealing with generally domestic based narcotics traffickers.

3. I have received instruction relative to conducting drug investigations while attending the DEA Basic Narcotics Training Class, the Connecticut Police Academy (POSTC) in Meriden, Connecticut as well as numerous training classes relative to narcotics trafficking. Over the past ten (10) years in law enforcement, I have participated in numerous seizure warrants which have resulted in the seizure of narcotics, United States currency, assets acquired with drug proceeds and assets utilized to facilitate drug activities.

4. I have participated in numerous investigations involving individuals suspected of distributing illegal drugs, coordinated controlled purchases of illegal drugs utilizing cooperating witnesses, confidential sources and undercover agents/officers, and obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs. Moreover, I have conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, provided testimony in jury proceedings, and spoken with informants and subjects, as well as other local, State and Federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their

illegal drugs. In addition, I receive periodic in-service training relative to conducting drug investigations. In the course of my duties, I have assisted state and federal prosecutors prepare affidavits in support of applications for federal/state search warrants and arrest warrants, and have executed numerous federal/state search and arrest warrants. I have supervised the activities of cooperating witnesses who have provided information and assistance in both state and federal prosecution of drug offenders. In my time with the DEA, I have participated in multiple Title-III investigations. As a result of my training and experience, I am familiar with the manner in which controlled substances are commonly imported, manufactured, processed, packaged and distributed. I know the relative wholesale and retail value of various types of controlled substances. I am familiar with behaviors, methods and common practices of persons and organizations that illegally import and distribute controlled substances, as well as the devices commonly utilized by them.

5.  I make this affidavit in support of an application for a complaint and arrest warrant charging Michael SMITH a.k.a. "Fat Mike" and "Big Mike" ("SMITH") with possession with the intent to distribute, and distribution of, heroin, a Schedule I controlled substance and cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). SMITH's date of birth is March 16, 1986 and his FBI number is 916453AC9. He is a convicted felon with eleven (11) prior arrests in the State of Connecticut for offenses including possession of narcotics with intent to sell, sale of illegal drugs, carrying a weapon and resisting arrest.

6.  I am familiar with the facts and circumstances of the investigation into SMITH as a result of my personal participation in the investigation; from discussions with agents of the DEA and other law enforcement personnel; from information provided by witnesses involved in

3

the investigation; from my review or the reviews by others to whom I have spoken of pen register and telephone toll records; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable.

7. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a warrant, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish probable cause.

## Probable Cause

*Controlled Purchase of Heroin from Smith on September 9, 2019*

8. Confidential Source Number Two ("CS-2") has been a DEA CS since approximately August 2019. Information he/she has provided has been corroborated through multiple controlled purchases of heroin and independent information provided to members of the New Haven DEA. CS-2 is deemed by law enforcement to be truthful, accurate and reliable at this stage of the investigation and information provided thus has been corroborated. CS-2 does not have an arrest record on file, but has been arrested in the past for motor vehicle violations which have been dismissed/nolled. During the month of June 2019, members of the DEA New Haven

*[handwritten: CS2 is providing information in part for compensation]*

4

spoke with CS-2 regarding his knowledge of the SMITH DTO. CS-2 stated that he/she has been purchasing heroin from the SMITH DTO for the past three years on a daily basis.

9. On September 09, 2019, CS-2 purchased three (3) bags of suspected heroin from SMITH for $100 in DEA Official Advanced Funds (OAF). More specifically, at approximately 10:30 A.M., Agents met with CS-2 at a pre-arranged meet location where he/she and his/her vehicle were searched for contraband with negative results. The CS did have a small quantity of U.S. currency on his/her person which was relinquished to controlling agents and later returned upon completion of the controlled purchase.

10. At approximately 10:38 A.M., in the presence and under the direction of Agents, CS-2 placed a recorded telephone call to a telephone number known by me which was answered by SMITH. During the call, SMITH directed CS-2 to go to the parking lot at La Quinta Hotel (400 Sargent Drive in New Haven):

> CS-2:   "Yo"
>
> SMITH:  "Yo"
>
> CS-2:   "Where you at"
>
> SMITH:  "I am on Long Wharf at the La Qunita"
>
> CS-2:   "OK I will be there shortly"

11. CS-2 advised controlling agents that it is out of the ordinary for him/her to request a certain quantity of heroin from SMITH over the phone 1. CS-2 stated that typically he/she requests the quantity of heroin in-person, once at meeting location given by SMITH.

12. Prior to departing the pre-arranged meet location, controlling agents provided CS-2 with the $100 OAF and an audio recording device. The CS then departed the meeting location and traveled directly to the agreed upon meeting place of the parking lot at La Quinta Hotel

while under continuous surveillance by ground and aerial units. Moments later, surveillance observed CS-2 pull into the parking lot at the hotel and park his/her vehicle. Moments later, surveillance observed CS-2 move his/her vehicle to the rear of the parking lot. CS-2 stated while he/she was waiting for SMITH to arrive, he observed an unknown white female parked in the lot behind him/her. CS-2 stated he observed the female walk over to a white Jeep that was parked in the lot. CS-2 stated he/she believed the female was also in the lot for the purposes of purchasing narcotics from SMITH. Shortly thereafter, surveillance observed a white colored Jeep Cherokee bearing Florida registration LDRB27 pull behind CS-2's vehicle. Moments later, surveillance observed the driver's side door to the Jeep Cherokee open and SMITH, who was wearing a white hooded sweatshirt, black jeans, and white sneakers exited the Jeep and walked to the driver's side of CS-2's vehicle. SMITH then gave CS-2 three (3) bags of suspected heroin in exchange for the $100 OAF. During their interaction, CS-2 and SMITH had the following conversation which was recorded via covert audio recorder:

> SMITH: "It's kinda hot."
>
> CS-2: "You wanna come to me, get in the car…playing hop scooch and shit, my bad"
>
> SMITH: "I never told you to get out of the car, you saw me opening my door."
>
> CS-2: "Three, where'd you get that hoodie?"
>
> SMITH: [Unintelligible]
>
> CS-2: "That's dope."

13. the above conversation, I believe that SMITH said there was law enforcement activity in the area ("It's kinda hot") and scolded CS-2 for exiting his/her vehicle just prior to

their heroin transaction ("I never told you to get out of the car"). CS-2 then apologized ("my bad") and requested three bags of heroin from SMITH ("three"). Indeed, CS-2 did briefly exit his/her vehicle just prior to the transaction because he/she incorrectly believed SMITH wanted to do the drug deal from his Jeep. Based on my training and experience, I know that narcotics traffickers often use the term "hot" to describe any area in which law enforcement activity is high.

14. CS-2 was followed to a pre-arranged debriefing location where he/she relinquished custody of the purchased heroin and the covert audio recording device to controlling Agents, and confirmed that the heroin was purchased from SMITH. CS-2 and his/her vehicle were then searched for contraband with negative results. Controlling Agents later processed the suspected heroin, described as a tan powdery substance contained within (3) three small, clear plastic baggies, as evidence. A representative sample of the suspected heroin was field tested utilizing a True Narc analyzer, which yielded a positive result for the presumptive presence of heroin.

*Controlled Purchase of Heroin from Smith on September 23, 2019*

15. On September 23, 2019, CS-2 purchased three (3) bags of suspected heroin from SMITH utilizing $100 OAF. More specifically, at approximately 10:50 A.M., Agents met with CS-2 at a pre-determined location where he/she and his/her vehicle were searched for contraband with negative results. At approximately 11:13 A.M., CS-2 placed a recorded telephone call, while in the presence of Agents, to SMITH. SMITH answered the phone and had the following conversation with CS-2 which was overheard by controlling Agents and audio-recorded:

    SMITH:    "Yo"

    CS-2:    "What up?"

|  |  |
|---|---|
| SMITH: | "Whats good cuz?" |
| CS-2: | "Where ya at?" |
| SMITH: | "Ummm…go to Pine and Clinton, I will be there in 10 minutes" |
| CS-2: | "Alright I will be there in like 15." |
| SMITH: | "Alright." |
| CS-2: | "Alright bye." |

16. Here, in the above conversation, CS-2 indicated he/she wanted to meet SMITH ("Where ya at?") and SMITH directed him/her to the intersection of Pine Street and Clinton Avenue in New Haven ("go to Pine and Clinton"). CS-2 and SMITH agreed to meet in about fifteen minutes ("be there in like 15" and "Alright"). Prior to leaving to meet SMITH, controlling Agents provided CS-2 with $100 OAF and covert audio/video recording devices.

17. At approximately 11:18 A.M., CS-2 then departed the meeting location and traveled directly to the area of Clinton Avenue and Pine Street while under continuous surveillance by air and ground units. At approximately 11:29 A.M., CS-2 arrived in the area and parked on Pine Street near Perkins Street. At approximately 11:30 A.M., CS-2 sent a text message to SMITH which read, "I'm here 3". Here, CS-2 advised SMITH that he/she had arrived at the agreed upon meeting location ("I'm here") and wanted to buy three bags of heroin ("3"). The text message was not returned. This communication was later verified through a review of pen register data. Furthermore, controlling agents photographed the text message on CS-2's cellular telephone following the completion of the controlled purchase, which was later submitted as DEA evidence.

18. At approximately 11:35 A.M., surveillance observed a black Nissan Rogue, later determined to have Connecticut registration AV10297, arrive on Pine Street and slowly drive by

8

CS-2's vehicle. Surveillance observed CS-2 follow the Nissan Rogue in his/her vehicle a short distance to Maltby Street where both vehicles parked. Surveillance saw CS-2 exit his/her vehicle and walk to the driver's window of the Nissan Rogue where he/she remained for less than ten seconds. CS-2 and SMITH had the following conversation during their approximate ten second interaction, captured via covert recording devices:

> CS-2: "Thank you, sir"
>
> SMITH: "Alright."
>
> CS-2: "Drive safe."

19. CS-2 then walked away from the Nissan Rogue and returned to his/her vehicle. At the same time, the Nissan Rogue departed the area and traveled directly to 212 Exchange Street and parked in front of the residence. Surveillance observed SMITH walking down the driveway of 212 Exchange Street before losing sight of him. At that point, surveillance was terminated.

20. CS-2 was followed to a pre-determined debriefing location where he/she relinquished custody of the purchased suspected heroin, described as three (3) clear plastic baggies each containing a tan powdery substance, and the audio/video recording devices to controlling agents. CS-2 and his/her vehicle were searched for contraband with negative results. Controlling Agents debriefed CS-2 who confirmed that SMITH had arrived alone in the Nissan Rogue and handed him/her three (3) bags of heroin in exchange for $100 OAF. CS-2 stated that SMITH already had the requested quantity of heroin on his lap when he/she was approached his driver's window. Agents then transported the heroin and the audio/video recording devices to the NHDO where they were submitted as DEA evidence. On the same date, a field test of the

suspected heroin was conducted which produced a positive result for presumptive presence of heroin.

*Controlled Purchase of Heroin and Crack Cocaine from SMITH on October 16, 2019*

21. On October 16, 2019, CS-2 purchased three (3) bags of suspected heroin and two (2) bags of suspected crack cocaine from SMITH utilizing $140 OAF. More specifically, at approximately 11:30 A.M., Agents met with CS-2 at a pre-determined location where his/her vehicle and person were searched for contraband with negative results. At approximately 11:42 A.M., while in the presence of Agents, CS-2 sent a text message to SMITH. The text message sent from CS-2 to Target Telephone 1 read," Yoo where you at?" At approximately 11:43 A.M., Target Telephone 1 responded to via text message to CS-2 with, "Carlot". At approximately 11:45 A.M., CS-2 responded to Target Telephone 1 via text message which read, "Ok be there in like 15".

22. Here, in the above listed conversation, CS-2 indicted he/she wanted to meet SMITH ("Yoo where you at?") and SMITH directed him/her to his location ("Carlot"). CS-2 agrees to meet SMITH in about fifteen minutes ("Ok be there in like 15"). Prior to CS-2 leaving to meet SMITH, controlling Agents provided CS-2 with $140 OAF and covert audio/video recording devices. CS-2 described to Agents the meet location ("Carlot") to be in the area of Forbes Avenue.

23. At approximately 11:45 A.M., CS-2 then departed the meeting location and traveled directly to the area of Forbes Avenue and Fulton Terrace while under continuous surveillance by ground units. At approximately 11:59 A.M., CS-2 arrived in the area of Forbes Avenue and parked on Fulton Terrace. At that time, CS-2 sent two (2) text messages to SMITH which read, "I'm here" followed by "3 and 2". Here, CS-2 advised SMITH he/she had arrived at

10

the agreed upon meet location ("I'm here") and the requested amount of drugs CS-2 required, three (3) bags of heroin and two (2) bags of crack ("3 and 2"). This communication was later verified through a review of pen register data. Furthermore, controlling agents photographed the text message on CS-2's cellular telephone following the completion of the controlled purchase, which was later submitted as DEA evidence.

24.     At approximately 12:03 P.M., surveillance observed CS-2 pull away from the curb and he/she began following a black Acura TL bearing Connecticut registration 0AS-MS4. Surveillance observed CS-2 follow the Acura in his/her vehicle a short distance where both vehicles parked. Surveillance saw CS-2 exit his/her vehicle and walk to the driver's window of the Acura TL where he/she remained for approximately ten seconds. CS-2 and SMITH had a brief conversation during their interaction, captured via covert recording devices. During the in person meeting, CS-2 asked SMITH for three (3) "D" and two (2) "hard". Based on my training and experience, I know that "D" is referred to as dope (heroin) and "hard" is referred to as crack cocaine (cocaine base). CS-2 then walked away from the Acura and returned to his/her vehicle. At the same time, the Acura departed the area at which point surveillance was terminated.

25.     CS-2 was followed to a pre-determined debriefing location where he/she relinquished custody of the purchased suspected heroin and crack cocaine, described as three (3) clear plastic baggies each containing a tan powdery substance and two (2) clear plastic baggies each containing a white hard rock like substance as well as the audio/video recording devices to controlling Agents. CS-2 and his/her vehicle were searched for contraband with negative results. Controlling Agents debriefed CS-2 who confirmed that SMITH had arrived alone in the Acura and handed him/her three (3) bags of heroin and two (2) bags of crack cocaine in exchange for $140 OAF. CS-2 stated that SMITH had a sandwich bag filled half way with pre-packaged

suspected heroin and crack cocaine that he retrieved the drugs from while CS-2 was at the driver side door. Agents then transported the heroin, crack cocaine and the audio/video recording devices to the NHDO where they were submitted as DEA evidence. On the same date, a field test of the suspected heroin and crack cocaine was conducted which produced a positive result for presumptive presence of heroin and cocaine base.

## CONCLUSION

26.   I submit that this affidavit supports probable cause for a complaint and arrest warrant charging Michael SMITH with possession with the intent to distribute, and distribution of, heroin, a Schedule I controlled substance and cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

Respectfully submitted,

Scott Vitelli
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on 20 December, 2019

   /s/ Sarah A. L. Merriam, USMJ
SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT